Good morning, Your Honors. May it please the Court, my name is Casey Donovan and I represent Christopher Paul Rushing. Can you keep your voice up, please? I represent Christopher Paul Rushing and I'd like to reserve the three or four minutes of my time. Mr. Donovan, who wrote the blue brief in this case? I did. Where did it come from? Some of it came from Federal Defenders with respect to the issue of the coming, bringing to the United States. You just word processed a chunk of the Federal Defenders brief in the Lovett case? I believe so, yes. I believe that's the case. You even have headings in here saying the government commented on Mr. Lovett's right to remain silent. Obviously I missed that, Your Honor. I mean, that's when I'll call sometimes Federal Defenders or other people at the council, ask if they have something on the issue. They'll send it to me. You didn't even change the names. That's a mistake that I haven't even noticed until today, reading through it. You know, I didn't notice it either, but the problem that lawyers have is we've got a lot of sharp law clerks. They come running to my office and say, wait till you see this. We've got two briefs and one of the briefs even uses, didn't even bother to change the names. I apologize to the Court. I mean, I don't, for that, for that oversight. I don't, I read the cases, I changed them. Hang on. Did you even read the material that you copied verbatim from the Federal Defenders brief? I'm sure I did. All I'm saying is the heading is something that I obviously missed. I apologize. Well, everything that Judge Trott said and implied in his questions I agree with, but I will also say that it's a good thing to save your client money by not duplicating work. Well, I apologize for the oversight. Not to worry. And that hopefully won't happen again. With respect to the, my understanding is with respect to the Muniz, the issue of bringing to, that's been submitted under United States v. Rasmussen-Muniz, 045086. So I will not be commenting on that issue. This essentially is the case of a 50-year-old man named Mr. Rushing who, with no prior criminal record, apparently got intoxicated to some extent and drove a car with an alien inside it. It's our argument that the evidence was insufficient with respect to the issue of financial gain. Even the district court judge in commenting that it was very slim, that there was incompetent evidence with respect to the issue of gain. In fact, the only evidence that the court relied on in the Rule 29 was this simple question on recross by the defendant's own counsel that someone told, some unknown person told the alien that he would have to pay. It's our position that that was hearsay, that was improper, that there's no other evidence in the case with respect to gain, and especially here. Now, assuming that it's hearsay and should not have been admitted, what do we do with the fact that it was defendant's counsel who enlisted the answer? I understand that, Your Honor, but I think in the context, you have to understand that what the court also is somewhat aware of is that that same witness was denying everything that he had basically said. So it was a question of how the jury took it. And it's our position that in combination, the combination of that with the fact that they're really relying, and this is another argument, with deading and abetting. In other words, because they're relying that the issue of gain, there's no evidence that, and the court agrees, there's no evidence of gain with respect to Mr. Rushing. The question is, does he as the aider of abetter have the specific intent of the unknown others to be convicted under that theory? I think what's interesting here is in the, when the case was indicted, there was really no other third person because there was an alleged statement by the defendant which was suppressed or was not used by the government that was before the grand jury. And the alien at that time had made no admissions concerning Mr. Rush, Rushing, so that the theory in the grand jury was different than the theory at the trial, because at the trial, the theory was that there was this, he was aiding and abetting these other unknown people, and that therefore it comes in, whereas in the, in the grand jury stage, they would have admitted his statement before the grand jury because there was no other evidence from the alien at that time as to gain. And as I say, the issue changed at trial because the government couldn't use the statement of the defendant because of Miranda issues. And so they never used that. And what happened was the alien flipped a week before trial, and that's where they got the evidence with respect to the others. And also the government's argument that the hearsay is admissible under the co-conspirator theory, which I think as they're saying is the only way it's admissible, and there is, obviously they never made any argument at the trial that there was a conspiracy or that this was admissible as a co-conspirator statement. Roberts. What was the objection at trial? Well, the objection was that it was hearsay on, during the direct testimony, and it was sustained by the judge. And then apparently during redirect, I mean, recross of the witness, that's when this one question was, didn't someone, you know, tell you that they were going to be paid? And I assume that the argument was that because it wasn't Mr. Rushing and it was this unknown third person that's saying it, that it was not sufficient to sustain a conviction under aiding and abetting. So I think that's why it's a little confusing from the record, is that the – in the presentation to the grand jury, there really was – even though they put in – that's one of the reasons we argued about the aiding and abetting, adding an element in the grand jury, is that there was no issue in the grant of aiding and abetting. Well, who's Mario Gonzalez-Karnica? He is the alien. And his initial statement when he was arrested was he did not identify the defendant and he did not say that he had anything to do with gain. The defendant made a statement on videotape with a denial, but also that he had been offered $300. That is, I assume – I was not the attorney at the time – was what – how the government presented the case in the grand jury. Sir, to come to the United States, were you going to pay any money to come to the United States? Yes. Who was going to pay money? My aunt or my sister? Between my aunt and my sister. Right. But that was all – as I understand it, the court – even the trial court said that was incompetent, because he went then on to say, that witness, during the course of the trial, that his aunt – he had no conversation with his aunt. Okay. Did somebody make a motion to strike that evidence because it was incompetent? I don't – I believe they made the motion to strike it because it was hearsay. I don't know whether there was any – the only – the incompetence was made during the argument at the Rule 29. And the judge basically agreed with it. In other words, the counsel said it's unclear, it's murky, and it's incompetent. The judge said, I agree with you, except you asked this question and got this answer. And that's essentially what the record is, you know, is pretty clear on. And then the judge went on to say, there's really no other evidence, but I'm finding under the Ninth Circuit law that it's sufficient because of that single question and response. Yeah. It may or may not have been incompetent, but it does not strike me as hearsay. That is to say, the stuff on the record. I mean, were you going to pay? Yes. That's not hearsay. He might have been mistaken, but it's not – it wasn't hearsay. Well, he went on to say that he was not going to pay. I mean, because the alien said he was not going to pay? He then went on and said that he never had that conversation. And I think you may be right. I'm just saying the judge said that everything was incompetent, was not permissible except the one statement, one question. Yeah. Well, he says, you know, it's going to be my aunt or my sister. And then the cross-examination is, but you never spoke to your aunt or your cousins. Right. You know, it doesn't – That specifically takes it out of hearsay. No, you never – I'm not relying on anything they said. I never talked to them. Right. But I had a specific agreement with my sister, and we had this arrangement. Right. But I'm saying when you read through the transcript, he then, on redirect or whatever it says, I never spoke to them. I never had any conversation with them. So it's negating. He said he never spoke to his aunt or his cousins. About the arrangement. I know, but a cousin isn't a sister. Well, that may be a correct reading, Your Honor. Another issue is the – in this close case is the question of the Griffin error in closing. And counsel's right. I was not the trial lawyer. It was a reading of the cold record. My reading of that cold record is it's a clear indication that if Mr. Rush – Mr. Rushing would have said, and then he stops himself and goes on to insert reasonable persons. But the clear implication of what he's saying is the defense is if he didn't know and he was duped. What was the objection? There was no objection. It's here for clear error. For plain error. Plain error. I mean, there was no objection. Why is it plain error? Because it's – it's error. It has to be error. It has to be plain error, not something that's ambiguous. It has to affect substantial rights. How did it affect substantial rights? Well, here is the defendant's substantial right to not testify, to remain silent, not have that commented on. I mean, the response to – the only way this came out was the defense lawyer in his summation response to the opening said – the government said, why wouldn't he know? Why – and the defense lawyer said, well, the people who are doing this wouldn't tell you, so you'd have – so they couldn't be cooperating on it. So they wouldn't – the person who was arrested couldn't rat on them. What – what sentencing issues do we have before us, if any? The sentencing issues, I submit, Your Honor, are still alive and well in the memory. There was the Booker error because the – How can that be, though? This was a mandatory minimum sentence. No matter what happens, it gets the mandatory minimum sentence. How do you get around that? Judge, if you could just bear with me. This – at the sentencing, this was a guy who had a drinking problem and a drug problem and was not argued in the – in the – in the sentencing, basically, because it wasn't under the guidelines applicable. In fact, it was the reverse. If he had a drug problem or a drinking problem, it would be a negative as opposed to a positive. This guy had no record, 50 years old. So none of those 3553 or 5H issues were argued in front of the judge. At the end, I, who was the sentencing lawyer, asked the judge to recommend the 500-hour drug treatment program for this guy. And the judge refused to do it, basically, I think, because he – maybe the defendant gave him a hard time at trial and also because it hadn't been argued and it wasn't applicable. What I'm arguing is that this case should be remanded because, A, there's a Booker error, because he made the factual fine as to the substantial creation of injury. So it should go back to that. And then it can, when – at re-sentence, he can, even though it's a mandatory minimum, he can make a fining to recommend in his discretion the 500-hour drug treatment program. And that does have an immediate and substantial impact on the sentence, because even though it's a 36-month mandatory minimum, he would get 7, 8, maybe 9 months credit if he did the 500-hour drug treatment program. This guy has never had any trouble. Kennedy. I don't understand how Booker error ties into your mandatory drug treatment argument. What does that have to do with what the jury found or didn't find? Well, because – no. That's – my understanding is that because there's Booker error, it should – it should be remanded. And also under Ameline, because – So you're just telling us you want to argue something again that you lost on in the district court that has nothing to do with the Booker error. No. There's – in addition to the Booker error, there's the Ameline error because the judge felt that the guidelines were mandatory at the time he sentenced this individual. The guidelines were mandatory, and therefore his guideline range, which would be lower, I would submit, on the remand. Would the judge free, even in a mandatory minimum context, to accede to your request for this unusual treatment? There's nothing that prevented a mandatory minimum person from getting the same kind of thing that you're talking about that I'm aware of. Well, what I'm saying is that he now can do that. He can now – He could have done it before with mandatory minimum, could he not? Well, but the issue – Could he not? He could have granted it. That's correct. Exactly right. And so that's the whole point. This doesn't seem to have anything to do with Booker or Ameline. He listened to you. He had the possibility of doing it. Turned you down. Well, I – And I don't see how that's affected one way or another by his Booker or Ameline  Because under the guidelines, counsel was not permitted to argue the drug use, alcohol abuse issue in a favorable light. Because under the guidelines, they can only be in unfavorable light. They're not ordinarily taken into consideration under 5H1.6 and 5H1.7. So that's the difference. In other words, those – and all the other 3553 arguments. This is a guy who had run a business his whole life, had a good family, had never been in trouble. All those arguments that were not permissible. Well, they weren't permissible for guideline purposes, but weren't they permissible for trying to get him into the 500-hour treatment program? Because they were not argued – well, I did make an argument. Exactly right. You made that argument. Right. And I'm saying – The judge turned you down. Yes, he did. And I'm saying – but I'm saying because he had – the sentencing was still deemed under – my argument is that under Ameline, when it goes back, he could make a finding that could reduce the guideline analysis. If he has to – if he does that, which I suspect he should do, then he has to reanalyze his sentencing, even though it's the mandatory minimum. And when he reanalyzes his sentencing and we're allowed to make arguments with respect to this, as Ameline has said, there's a possibility it could impact this man's prison sentence. As I said, this is a guy. Okay. But we – I think we have the argument in hand. We've taken you over your time. Let's hear from the government and then we'll allow you a chance to respond. I apologize again, Your Honor, with respect to that. It's not very persuasive to have something like that happen. You know, it looks like a canned brief. I agree. I apologize. Good morning, Your Honors. May it please the Court. My name is Kevin Mulcahy. I represent the United States in this matter. I think the principal issue that appears to be argued here is the hearsay, and I'll jump right to that. The way that the hearsay came in in this case, or the non-hearsay came in in this case, the out-of-court statements, perhaps is a better way to say it, is in fact the material witness indicated that it was his understanding his aunt or his sister would have to pay. Thereafter, during cross-examination, and then again on re-cross-examination, it came out that the defendant had actually discussed payment with the smugglers. And that is what the district court relied on in denying the Rule 29 motion, and properly so. These are co-conspirator statements in every sense of the word, and, therefore, they are not hearsay. The district court did not rule that these were co-conspirator statements, and the reason is there was no objection below. This issue was never raised. And, therefore, what it came down to was whether or not evidence that had been received at trial was sufficient to show financial gain. And Mr. Donovan is correct when he indicates that this material witness, this alien, Mr. Gonzalez, was inconsistent in his statements. He testified that at the port of entry he lied to the inspectors and said he didn't know the driver, Mr. Rushing. He never told anyone that he spoke to Mr. Rushing until the day of trial. And all of that came out, the inconsistencies, his hesitation towards testifying at first, all of that came out before the jury. And, as Your Honors are aware, in a credibility determination like that, the jury is And clearly they accepted some of it in finding this to be a financial gain. Can you explain to me where the alien is in relationship to the driver? I really had a hard time understanding. Physically within the vehicle, Your Honor? Yeah. Transporting somebody in a gas tank. That didn't make any sense to me. Okay. This vehicle was a Chevrolet, and it was the so the driver was up front sitting in the driver's chair, obviously. Underneath the back seat is sort of a better way to conceptualize where this alien was. I said the back seat. Underneath the back seat is the gas tank. And what happened was they had cut the top off the gas tank itself and laid him down into the gas tank, then put the seat back on top of him. And the gasoline is in the window, in the windshield washer well? Correct, Your Honor. And there was a line or some type of hose. It was a hose that ran from the back where typically the gas would be engaged up to the front of the vehicle, actually right underneath the driver's seat, into the windshield wiper. And so there was about a gallon's worth of gas in the windshield wiper fluid. So you got about a 20-mile range on that car. Correct, Your Honor. Okay. And I think that's important for one of the arguments here with regard to aiding and abetting. The suggestion that this was perhaps Mr. Rushing alone was never the theory, at grand jury or otherwise, of the government. That is plain for a number of reasons, not the least of which is that the alien indicated he was in Mexico at a house with other people to come over and be smuggled. In addition to the vehicle only being able to go about, you know, within 20 miles or 30 miles of the border, and he indicated his final destination was Los Angeles. He wasn't going to Los Angeles in that car. There was going to have to be another car and presumably another driver. Also... Sure, that car would be turned around and brought back across the border. What's the sentencing issue in your view? There is none, Your Honor, as a result of the minimum mandatory sentence. We completely agree that if this was not a minimum mandatory case, or if Your Honors found that there was not proper evidence of financial gain, then in fact he should be sent back down. And Mr. Dotto argues somehow that the treatment of this case impaired his ability to pursue the special treatment option. Your response to that is what? That issue is independent of any guideline calculation, any custodial time calculation. What it is, is it's an obviously, Your Honors, I'm sure aware of the 500-hour drug treatment program allows this judge to sentence individuals who need it to undertake that treatment. And, yes, they get a break in their sentence. What this judge specifically held was Mr. Rushing doesn't need it. He's not a drug addict. He's not an alcoholic. He doesn't need this program. And the only reason the request was made for this program, what the judge found, was so he could get time off his sentence. It's not the reason for the program, and the judge denied it. So my argument, I guess, in full is, or in short, is he had a chance. The judge heard him out, denied the request. There's no reason to do it again. Thank you. Okay. I will sit down and answer any other questions. Okay. Thank you very much. Mr. Donovan, response. Just briefly, the gist of the record is clear. Although he had no prior criminal record, he was arrested for being under the influence of drugs, and there's a specific reference to him, some kind of meth type of ---- Did you present evidence that he was a drug addict as compared to somebody who was an occasional user? No, I did not present that at sentencing. As I said, I wrote the pre-sentence report, and it really was not an issue with respect to ---- What I'm saying is if it ---- when you argue it as a pre-sentence issue, in other words, now when we go back under the new system, which is the old system, I would be able to lay out in my sentencing program what his addiction was, what the record for that was, because it would impact ---- Was he an addict? Is he an addict? I believe he has two problems. He has a drug problem, and he has a serious alcohol problem. And that was witnessed in the fact in the videotape he was intoxicated. So, I mean, there was ---- But what prevented you from putting forward all of this as a way to get the drug program? Because you say that that was available to you even before Booker, even before Allen. That may be my ---- that may fall on my shoulders. You know, I was assigned C.J. after the trial attorney was relieved. I wrote up the pre-sentence report. And essentially what you do with a 500-drug treatment program is it's not ---- it's something that you request on the sentencing day. And maybe I overlooked it, but one of the driving things was that when you're doing the pre-sentence report under the old system, those issues couldn't impact it. And so you're obviously, you know, you're making a possible decision of cutting, you know, portraying someone as a serious problem when it can be a negative only to the court. In other words, it could only be a negative. And that's when you haven't decided the guideline range. That's what I'm saying is on remand, using the ---- they can now be used as a positive within the guidelines and within the sentencing, just like in the old days. In other words, if a guy has a serious alcohol problem ---- Kagan. At sentencing, was there a serious argument that the mandatory statutory minimum did not apply? No, because it's ---- Well, in other words, if there's no serious argument that the mandatory statutory minimum did not apply, anything that you're talking about with respect to the guidelines is irrelevant, because the guideline range was going to be lower. Well, that's true, except I believe I made some argument with respect to the ---- I think the judge referred to it with respect to the Rule 29, you know, that he would dismiss the Count 1 based on Rule 29C. Okay. And that would have solved the problem. That would have solved the problem. I got it. Okay. Mr. Donovan, were you appointed to represent Mr. Rushing in this appeal? What happened, Your Honor, is that when in the district court I was appointed to replace the trial lawyer who was relieved, when you do that in the Southern District of California, you automatically stay on to do the appeal. And to whom do you submit a request for payment for the brief that you borrowed from the Federal Defender? I submit that to you people. And ---- Did you submit that already? No, it's not ---- Are you going to indicate in it that you borrowed most of it from the Federal Defenders? Well, I usually don't indicate that. What happens is it's reflected in the hours used to create the brief. In other words, there's a substantial saving, as the Court said, when you're able to get an argument and have much of it done where you just have to review the law. So, you know, it saves the court time. But, you know, there's a pretty strict limit on how much money you can bill at all minimum in these cases. As you can see, this is a 50-page brief and certainly is not going to be billed as that if I had done the complete research on all the issues. I did the research on the ones I felt important. And I am not embarrassed to say that that's one of the great resources of Federal Defenders. They're here all the time. They do a lot of issues. And it's not unusual to ask them to send them a brief on some of the issues. But, yes, to – if you want me to, I will specifically say that this was substantially, you know, taken. But I usually – it's taken into account in the billing. Any further questions from the panel? Okay. Thank you very much. Thank you both sides for your argument. The case of United States v. Rushing is now submitted for decision. The next case on the calendar, United States v. Andrade Rivera, has been submitted on the briefs. The next argued case is United States v. Hernandez-Sanchez.
judges: Trott, W. Fletcher, Restani